# RICHARD J. MA, ESQ.

20 Vesey Street, Suite 400
New York, New York 10007
Tel. (212) 431-6938
Fax. (212) 964-2926
E-mail: richardma@maparklaw.com

June 12, 2020

<u>*Via ECF and E-Mail*</u>
Honorable Andrew L. Carter Jr.
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

Honorable Laura Taylor Swain
United States District Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

# <u>MEMO ENDORSED</u>

      Re:    *United States v. Malik Holloway*
                19 Cr. 897 (ALC) and 20 Cr. 126 (LTS)

Dear Judge Swain and Judge Carter:

     I represent Mr. Malik Holloway in the above-referenced matters, having been appointed pursuant to the provisions of the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A. This correspondence is submitted to respectfully request orders granting Mr. Holloway's release on bail for the pendency of his cases, pursuant to the Bail Reform Act. The Government is opposed to this request. We have discussed this application with Mr. Holloway and, should the Court grant a hearing, Mr. Holloway would prefer to be present via video- or tele-conference if possible, but waives his appearance if necessary to expedite the resolution of this matter.

     *Introduction*

     Malik Holloway, 25, is incarcerated at the Metropolitan Detention Center in Brooklyn ("MDC"). In the wave of the global pandemic, MDC identified Mr. Holloway as "high risk" of contracting COVID-19 based on his asthma, which he has had since childhood. Mr. Holloway's health and safety must be ensured and the only effective way to do so is for Mr. Holloway to be released now to the care and safety of his family. The

Bail Reform Act provides for the "temporary release" of a person in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason. 18 U.S.C. § 3142(i). The risk of death or serious injury to Malik Holloway, given the conditions of incarceration and the ongoing health crisis, necessitates his temporary release on bail until this pandemic has ended. *See* 18 U.S.C. § 3142(g)(3)(A) (listing a person's "physical and mental condition" as one of the release factors to be considered in determining bail). Moreover, while incarcerated at MDC, it is presently impossible to prepare Mr. Holloway's defense. Accordingly, we respectfully request that Mr. Holloway be released pending this health crisis and live with his father, Melvin Holloway, under highly restrictive release conditions, including home detention, electronic monitoring and any other conditions Your Honor deems appropriate. The Government opposes this request.

### *Procedural History*

Malik Holloway is currently incarcerated on three matters; in addition to the two above-referenced Southern District cases, Mr. Holloway is currently serving a sentence for a violation of supervised release on a case in the Eastern District of New York.

Mr. Holloway has been incarcerated since October 10, 2019, when was remanded on the violation of supervised release in *United States v. Green, et.al.,* E.D.N.Y. 18 Cr. 60 (PKC). The supervised release term stemmed from Mr. Holloway's guilty plea to one count of conspiracy to violate the Travel Act, in violation of 18 U.S.C. § 371, for which he received a sentence of 14 months. On January 13, 2020, Mr. Holloway pled guilty to a violation of supervised release and on February 12, 2020, he was sentenced to 24 months of incarceration. His expected date of release, as calculated by the Bureau of Prisons, is August 11, 2021, barely one year from now.[1] A copy of the Judgment is annexed hereto as Exhibit A.

On November 14, 2019, Mr. Holloway was arrested on the first of his two Southern District cases, and charged with felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1), which case is pending before Judge Carter (*United States v. Holloway*, 19 Cr. 897 (ALC)).

On March 12, 2020, Mr. Holloway was arrested on the case pending before Judge Swain (*United States v. Wilson, et.al.,* (20 Cr. 126 (LTS)), in which Mr. Holloway is one of twelve defendants charged with conspiracy to distribute and possess with intent to distribute heroin, fentanyl and crack cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A); and possession of firearms during a drug trafficking offense, in violation of 18 U.S.C. § 924(c). In both Southern District cases, Mr. Holloway consented to detention without prejudice to make a later request for bail.

---

[1] *See Federal Bureau of Prisons Inmate Locator, Malik Holloway* (June 12, 2020), available at https://www.bop.gov/inmateloc/

On May 29, 2020, Mr. Holloway, through his appointed counsel Gordon Mehler, Esq., moved in the Eastern District of New York for Compassionate Release or Temporary Release, pursuant to 18 U.S.C. § 3582(c)(1)(A) and 18 U.S.C. § 3142(i).  Oral argument on Mr. Holloway's motion is scheduled for June 26, 2020.

### *Malik Holloway's Medical Issues*

Mr. Holloway is a 25 year-old African-American male who has suffered from asthma since childhood.  *See* Medical Records of Malik Holloway, Exhibit B (submitted separately under seal).  He has been identified by the BOP as "high risk" of contracting COVID-19 because asthma creates a dangerous combination when paired with COVID-19.  According to the Center for Disease Control and Prevention ("CDC"), people with moderate to severe asthma may be at higher risk of getting very sick from COVID-19.  A district court recently laid out the danger that individuals with asthma face during this global pandemic: "CDC guidelines as of April 2, 2020, state among other things that 'people with moderate to severe asthma may be at higher risk of getting very sick from COVID-19.  COVID-19 can affect your respiratory tract (nose, throat, lungs), cause an asthma attack, and possibly lead to pneumonia and acute respiratory disease.' […] 'there is currently no specific treatment for or vaccine to prevent COVID-19.  The best way to prevent illness is to avoid being exposed to this virus.'" *United States v. Mahan*, No. 1:19-cr-00233-DCN, 2020 WL 1846789, at *4 (D.Idaho Apr. 10, 2020) (granting motion for release of defendant with asthma in light of COVID-19).  The court further noted in reference to asthma: "such a condition is particularly worrisome given the impact of COVID-19 upon the respiratory system, and the now-general knowledge that many of the deaths caused by the virus stem from pneumonia caused by the effect of the virus upon the lungs." *Id.*

COVID-19 does not only kill people.  For those who survive, they appear to have lasting damage to internal organs, especially the lungs.  COVID-19 attacks the specialized cells in the lungs that create the mucous-like film that permits the lungs to expand and contract with elasticity.  As the virus takes over individual lung cells and self-replicates, the original lung cells die.  With the death of these specialized lung cells, the lungs lose their elasticity, in effect turning from sponges into concrete.  As the lungs harden, depending on the individual's immune system, the body starts to flood the lungs with cells and fluid to fight the virus.  Fluid accumulation in the lungs turns into pneumonia.  The person's own body attacks the lungs, and the damaged and hardened lungs cannot expel the growing amounts of fluid.  In turn, an infected person struggles to breathe and experiences respiratory distress.  Oxygen levels plummet.  Blood pressure drops.  Kidneys fail.  If the person survives, damage to organs occurs.  If the person dies, it is brutal.  It is "like death by drowning."[2]

---

[2] *When coronavirus kills, it's like death by drowning – and doctors disagree on best treatment*, Mercury News (Apr. 13, 2020) at mercurynews.com/when-coronavirus-kills-its-like-death-by-drowning-and-doctors-disagree-on-best-treatment

Mr. Holloway has been prescribed an Albuterol inhaler for relief in case of asthma attacks.  *See* Medical Records of Malik Holloway, Exhibit B.  He reports that, within the past year, he has been hospitalized because he had difficulty breathing.  Additionally, his mother has asthma as well, reinforcing its genetic component. Finally, because of COVID-19, medical care in the MDC, which is never optimal under the best of circumstances, has gotten worse because most of the medical work is directed toward the virus.  Given this chronic condition, and as prison conditions worsen, we are concerned that Mr. Holloway is at an increased risk of illness and even death.

### *The COVID-19 Pandemic Compels Mr. Holloway's Release from MDC*

As the Court is well aware, we are facing a serious and urgent public health crisis.  On March 11, 2020, the World Health Organization officially classified COVID-19, a new strain of coronavirus, as a global pandemic.[3]  As of June 10, 2020, COVID-19 has infected over 7.2 million people worldwide, leading to over 413,000 deaths.[4]  In the United States, well over 2 million people have been infected, leading to a staggering total of nearly 113,000 deaths nationwide.[5]  As of June 10, 2020, New York City alone has counted just under 210,000 COVID-19 cases and almost 22,000 deaths;[6] while the BOP has counted 2,134 COVID-19 inmate cases, 190 BOP staff cases and 79 inmate deaths and 1 staff member death in facilities nationwide, along with 3,972 recovered inmates and 456 staff having recovered.[7]  We believe that these numbers underrepresent the true scope of the crisis; test kits in the United States even nearing three months after the start of the pandemic in the United States are inadequate to meet demands.

The CDC has also issued guidance related to the effects of COVID-19 on certain high-risk patients in the population.  The CDC has identified the population most at risk of severe illness or death from the disease to include "people of any age who have serious underlying medical conditions."[8]  Thus, while adults over sixty years old and people with chronic medical conditions are at heightened risk for COVID-19, younger individuals are far from immune from infection and are also at serious risk of infection.  They too face serious consequences upon infection, particularly if they have underlying medical condi-

---

[3] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), at https://bit.ly/2W8dwpS.

[4] *Coronavirus Map: Tracking the Global Global Outbreak,* New York Times, available at https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (updated regularly).

[5] *Id.*

[6] *Coronavirus Disease 2019, Cases in the US* (June 10, 2020), at https://www.cdc.gov

[7] *BOP Coronavirus Homepage,* BOP (June 10, 2020), available at https://www.bop.gov/coronavirus/ .

[8] *People At Risk For Serious Illness From COVID-19*, CDC (May 14, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal+https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html

tions.  Data from the CDC shows that roughly 40% of those infected with coronavirus were 18 to 44 years old — a greater portion of the infected than the 45 to 64 age range.[9]

COVID-19 is also disproportionately impacting and killing people of color of all ages.  Data from New York City shows that the African-American and Latino populations have the highest death rates.[10]  African-American and Latino inmates, such as Malik Holloway, are particularly vulnerable, and at risk of receiving inadequate medical care.  During the present pandemic, with our health care system severely stressed, they are at even greater risk of receiving poor or no medical care at all.  Mr. Holloway has already been designated a "high risk" inmate by MDC for his asthma.  Thus, there is a very real possibility that if he were to contract COVID-19 while being held at MDC he would become seriously ill and possibly even die.

### *The Conditions of BOP Incarceration Foster the Spread of COVID-19 and Mr. Holloway's Pre-Existing Medical Condition Renders Him Susceptible To An Unreasonable Health Risk And An Inability To Take Preventative Measures For Self-Care Recommended by the CDC*

Predictably, the disease has spread quickly throughout American prisons, as described above.  Conditions of confinement in prisons create an optimal environment for the transmission of contagious disease.[11]  Public health experts are unanimous in their opinion that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe," and "infection control is challenging in these settings."[12]  This rings even more true for individuals afflicted with asthma, as they are even more susceptible to serious respiratory complications.

Prisons are not hospitals and are ill-equipped to handle a health crisis of this nature.  No matter what the BOP is doing to minimize the risk, Mr. Holloway is still largely powerless to take many of the preventative self-care measures directed by the CDC for

---

[9] *Coronavirus Disease 2019, Cases in the US* (June 10, 2020), at https://www.cdc.gov . *See also Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S.*, The New York Times (Mar. 20, 2020), at https://www.nytimes.com/2020/03/18/health/coronavirus-young-people.html.

[10] *COVID-19: Data* (June 10, 2020), at https://www1.nyc.gov/site/doh/covid/covid-19-data-deaths.page

[11] *See* Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8): 1047-1055, at https://doi.org/10.1086/521910 ; *see also Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), available at https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap; *see also An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues,* The New York Times (Mar. 16, 2020), available at htps://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails.html.; *see also COVID-19 Infection Tracking in NYC Jails*, The Legal Aid Society (May 8, 2020) available at https://legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/ .

[12] *Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States* (Mar. 2, 2020), at https://bit.ly/2W9V6oS

his high-risk group to remain safe from COVID-19 infection. The MDC is a massive pretrial detention facility and houses approximately 1,650 people. Incarcerated individuals share bathrooms, sinks and showers. They eat together, socialize and sleep in close proximity to each other. They often lack access to basic hygiene items, much less the ability to regularly disinfect their living spaces.[13] Furthermore, jails have many who are medically compromised who contract infectious diseases such as COVID-19 and spread to others. Those who work in the facilities leave and return daily, with insufficient screening or testing. Indeed, even the warden of the Metropolitan Correctional Center was infected.[14] Clearly, Mr. Holloway cannot self-quarantine or truly partake in "social distancing." He is in prison, living in close proximity to others, hoping that he does not become infected while powerless to do anything about it.

High-density places such as prisons are precisely the kinds of spaces that have caused the alarmingly high-spread rates of COVID-19, mushrooming to over 5,000 cases in the BOP alone, not counting state prison facilities. Correctional health experts worry that no matter what precautions are taken by crowded prisons, these facilities may become incubators for the COVID-19 disease.[15] Alarmingly, statistics across the country from numerous jails show that this is exactly what has taken place: as of June 10, 2020, the BOP has confirmed COVID-19 cases in 65 facilities and 27 Residential Reentry management Centers.[16] Furthermore, we believe that these figures only reflect a fraction of the actual crisis, due to extremely limited and suspect testing in BOP facilities. MDC Brooklyn had tested only limited numbers of inmates weeks into the pandemic: "Officials in charge of Brooklyn's federal lockup have acknowledged a 'shortage of tests' at the facility, explaining that they had to prioritize certain inmates for testing while isolating other suspected cases at the 1,650-person facility."[17] At the Federal Correctional Institution

---

[13] *See e.g.*, David Patton, Exec. Director, *Statement from Federal Defenders of New York*, Federal Defenders of New York (Mar. 8, 2020), https://federaldefendersny.org/about-us/news/statement-from-federal-defenders-of-new-york.html; Public Health Experts' Letter, at 1; *Williams, 'Jails Are Petri Dishes'*; Brie Williams et al., *Correctional Facilities in the Shadow of COVID-19: Unique Challenges and Proposed Solutions*, Health Affairs Blog (Mar. 26, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200324.784502/full/ ("*Unique Challenges*"); *see also* Keegan Hamilton, *Sick Staff, Inmate Transfers, and No Tests How the U.S. is Failing Federal Inmates as Coronavirus Hits*, Vice (Mar. 24, 2020) https://www.vice.com/en_us/article/jge4vg/sick-staff-inmate-transfers-and-no-tests-how-the-us-is-failing-federal- inmates-as-coronavirus-hits ("*Sick Staff*") (noting access to hand sanitizer varies by facility).

[14] *Warden of Federal Jail In Lower Manhattan Has Coronavirus: Source,* (Apr. 17, 2020), at https://www.nydailynews.com/new-york/ny-mcc-warden-coronavirus-20200417-3pxt3phbrffv5goon32vboulvistory.html .

[15] *See* Michael Kaste, *Prisons and Jails Worry About Becoming Coronavirus 'Incubators,'"* NPR (Mar.13, 2020), available at https://www.npr.org/2020/03/13/815002735/prisons-and-jailsworry-about-becoming-coronavirus-incubators .

[16] *See BOP COVID-19*, Bureau of Prisons. (June 10, 2020) available at https://www.bop.gov/coronavirus/ .

[17] *See US Judge, Citing 'Low Number' of Positive COVID Tests, Vouches for Safety of Brooklyn Lockup in Denying Bid for Release,* law.com (May 6, 2020) available at https://www.law.com/newyorklawjournal/2020/05/06/us-judge-citing-low-number-of-positive-covid-tests-vouches-for-safety-of-brooklyn-lockup-in-denying-bid-for-release/# .

Lompoc facility in California, for example, a staggering 70% of inmates tested positive for the disease.[18]  According to the Marshall Project, at least 40,656 people in United States prisons had tested positive for COVID-19 by June 2, 2020, representing "an 18 percent increase from the week before."[19]

During the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases because they were unable to maintain the level of separation, hygiene and sanitation necessary to prevent widespread infection.[20]  During the current pandemic, the Prison Policy Initiative has called on our criminal justice system to release individuals at risk for serious complications and death from COVID-19.[21]

In short, the COVID-19 virus is highly contagious, extraordinarily dangerous and poses a threat to BOP-designated high-risk individuals like Mr. Holloway.

### *The Sixth Amendment Compels Mr. Holloway's Release*

The conditions of confinement at the MDC have abrogated Malik Holloway's Sixth Amendment right to effective assistance of counsel.  Until he is released, Mr. Holloway will continue to suffer violations of his constitutional rights.

The Sixth Amendment right to counsel is the cornerstone of our adversarial system of criminal justice.  As the Second Circuit recently emphasized, "the right to consult with legal counsel about being released on bond, entering a plea, negotiating and accepting a plea agreement, going to trial, testifying at trial, locating trial witnesses, and other decisions confronting the detained suspect, whose innocence is presumed, is a right inextricably linked to the legitimacy of our criminal justice system." *Federal Defenders of New York, Inc. v. Bureau of Prisons*, Docket No. 19-1778 (2d.Cir. Mar. 20, 2020).  In recognition of this vital right, Bureau of Prisons regulations instruct that detention center wardens "shall provide the opportunity for pretrial inmate-attorney visits on a seven-days-a-week basis."  28 C.F.R. § 551.1 17(a).

A detention facility violates the Sixth Amendment when it "unreasonabl[y] interfere[s] with the accused person's ability to consult counsel." *Benjamin v. Fraser*, 264 F. 3d 175, 185 (2d Cir. 2001).  In *Benjamin*, the Second Circuit held that New York City

---

[18] *70% of Inmates Test Positive for Coronavirus at Lompoc Federal Prison*, Los Angeles Times (May 9, 2020), available at https://www.latimes.com/california/story/2020-05-09/coronavirus-cases-lompoc-federal-prison-inmates .

[19] *See A State-by-State Look at Coronavirus in Prisons*, The Marshall Project, (June 4, 2020), available at https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons .

[20] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020), available at https://www.theverge.com/2020/3/7/21167807/coronavirus-prison-jail-health-outbreak-covid-19-flu-soap .

[21] *See* Peter Wagner & Emily Widra, *No Need to Wait For Pandemics: The Public Health Case for Criminal Justice Reform*, Prison Policy Initiative (Mar.27, 2020), available at https://www.prisonpolicy.org/blog/2020/03/06/pandemic .

correctional facilities violated the right to counsel when defense attorneys "routinely face[d] unpredictable, substantial delays in meeting with clients" and were "forced to wait between 45 minutes and two hours, or even substantially longer, after arriving at a facility to see a client. 264 F.3d at 179. Yet, the circumstances and conditions contemplated by the Second Circuit in *Benjamin* pale in comparison to those that Mr. Holloway has been forced to endure.

On March 13, 2020, the MDC suspended all visitation. Since then, Mr. Holloway's only means of communicating with counsel has been through time-limited telephone calls. These communications are possible only on an extremely limited and haphazard basis. While we have been able to speak with Mr. Holloway to confirm some of the details contained herein, the meeting durations and ability to communicate have been severely curtailed. Conducting substantive, meaningful discussion of topics critical to the defense has been nearly impossible. Moreover, Mr. Holloway cannot be assured that our calls and conferences are unmonitored and private, as other inmates and staff are in proximity. Ultimately, Mr. Holloway is being deprived of privileged conversation with counsel. This is inconsistent with the constitutional right to counsel. In *Wolfish v. Levi*, the Second Circuit held that a detention facility (the Westchester County Jail) "severely constrained" an inmate's "access to legal counsel" where dedicated attorney visiting hours were limited to two hours a day, and most attorney visits were "made in the general visiting rooms during visiting hours thereby entailing long delays, limiting the attorney's time with his client, and totally vitiating confidentiality." 573 F.2d 118, 133 (2d Cir 1978), *rev'd on other grounds*, 441 U.S. 520 (1979).

Perhaps of greater concern is the fact that Mr. Holloway has suffered a complete inability to review a copy of the discovery that has been produced. The initial production of discovery is approximately forty gigabytes of data and includes undercover buys, social media, prison calls and NYPD reports. While Mr. Holloway was notified on May 18, 2020, that a copy of his discovery was received by the MDC, for weeks he was unable to review the discovery because he was not permitted access to the MDC's library or any computer. Only on June 8, 2020, was Mr. Holloway permitted access to the library and he will have only one hour each week to review discovery on shared computers. And as his case progresses, there are no assurances that he will be able to access and review his discovery in a more consistent or meaningful manner, or that we will have a workable means for reviewing it with him, since videoconferencing meetings with MDC inmates are short and only available to those with "priority" need for such conferences. Thus, we have no confidence that we will be able to consult with Mr. Holloway meaningfully about his case over the weeks or months to come if he is not released from MDC custody.

Additionally, in the likely event that infected cases increase at the MDC, the entire facility will go on a total lockdown, further inhibiting Mr. Holloway's constitutional rights. As has already occurred, when an inmate at MDC tests positive for the coronavirus, the facility goes on indefinite lockdown during which time no inmates are allowed

into our out of the building for any reason, including court appearances.

In the throes of this public health crisis, the Court must release Malik Holloway to protect his physical health. On the two pending Southern District cases Mr. Holloway remains innocent until proven guilty. To mount and prepare a defense, and have effective assistance of counsel, Mr. Holloway must be released from custody. These extraordinary and unprecedented times require judicial intervention to safeguard Mr. Holloway's constitutional rights.

### *The Proposed Release Conditions Sufficiently Address Concerns Related to Flight and Dangerousness*

Under the Bail Reform Act, a district court can order pretrial detention only if it concludes "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In its determination the court evaluates the following factors: (i) the nature and circumstances of the offense charged; (ii) the weight of the evidence against the person; (iii) the history and characteristics of the person, including the person's character, family ties and whether the person was on release pending trial; and (iv) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

Where a defendant is charged with certain enumerated offenses, as here, a rebuttable presumption arises that "no condition or combination of conditions" can provide the requisite assurances. 18 U.S.C. § 3142(e)(3). The defendant then "bears a limited burden of production — not a burden of persuasion — to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Paulino*, 335 F.Supp3d 600, 610 (S.D.N.Y. 2018) (*citing United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (citation omitted)). Once the defendant satisfies this burden, the presumption is not eliminated, but remains a factor for the district court's consideration. *Id.* The Government still bears the burden of persuasion and must demonstrate dangerousness by clear and convincing evidence and risk of flight by a preponderance of the evidence. *Id.*

Mr. Holloway is charged with participating in a narcotics conspiracy in violation of 21 U.S.C. § 21 U.S.C. §§ 846 and 841(b)(1)(A); and possession of firearms during a drug trafficking offense, which firearms were brandished and discharged, in violation of 18 U.S.C. § 924(c). Our understanding from review of discovery materials and conversations with the prosecution is that Mr. Holloway is alleged to have been a supplier of cocaine and crack-cocaine in the narcotics conspiracy and that, while he had possession or access to one or more firearms, he was not involved in any alleged shootings or acts of violence.

Although Mr. Holloway does have a criminal history, our bail proposal is centered around highly restrictive and appropriate bail conditions that overcome the presumption that Mr. Holloway poses a danger to the community or is a flight risk. The proposed bail package requires that Mr. Holloway be released to to live with his father, Melvin Holloway, who lives alone in a two bedroom apartment in the Bronx. The apartment has ample space to accommodate Mr. Holloway and he could be quarantined if necessary upon his release. He will have the benefit of the support, structure and care of loved ones, in addition to location monitoring and strict pretrial supervision. He will be locked-down and on home confinement with family. Importantly, Mr. Holloway's father's apartment is far-removed from Mr. Holloway's old Bronx neighborhood where the offense conduct occurred. Mr. Holloway has neither the means nor wherewithal to flee, if flight is even possible at this time. Finally, Mr. Holloway has no incentive to flee. He understands that there is no way to evade law enforcement and that, once caught, he will be subject to imprisonment and additional charges.

Specifically, any concerns about danger if Mr. Holloway were released can be more than adequately addressed through restrictive release conditions. With the Government's and the Court's anticipated concerns in mind, we present the following release conditions:

a. $100,000 personal recognizance bond, co-signed by 2 financially responsible persons;
b. Mr. Holloway must live at his father's residence. He is unable to relocate without prior approval by Pretrial Services;
c. The residence is not to have visitors, other than family and a limited number of pre-approved individuals;
d. Mr. Holloway is to be confined to his father's residence, except for activities specifically approved by the Court and as pre-approved by Pretrial Services. Pretrial Services will monitor Mr. Holloway's compliance with home confinement through location monitoring;
e. Strict pretrial supervision, including random or daily remote/virtual monitoring through the use of a phone with video-calling capabilities;
f. Mr. Holloway shall not have contact with any co-defendants, witnesses or victims; and
g. Telephonic status conferences with the Court bi-weekly, or as the Court deems appropriate.

We are confident that these proposed highly restrictive conditions demonstrate that any dangerousness or risk of flight associated with Mr. Holloway can be overcome.

Alternatively, the Bail Reform Act also provides for the "temporary release" of a defendant in pretrial custody "to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling

reason." 18 U.S.C. § 3142(i).  As courts in the Southern District have already recognized, "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason under 18 U.S.C. § 3142(i)."  *See, e.g., United States v. Stephens,* 15-CR-95 (AJN), Dkt. 2798 at 5, (S.D.N.Y. Mar.19, 2020).

Malik Holloway's "high risk" of infection because of his serious underlying medical condition "present[s] a unique combination of circumstances giving rise to [a] situation that [is] out of the ordinary.  *DiSomma*, 951 F.2d at 497; *see also United States v. Perez*, No. 19 Cr. 297 (PAE), 2020 WL 1329225, at * 1 (S.D.N.Y. Mar. 19, 2020) (granting defendant's bail application in light of the "unique confluence of serious health issues and other risk factors facing this defendant … which place him at a substantially heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, No. 15 Cr. 95 (AJN), 2020 WL 1295155, at *1-2 (S.D.N.Y. Mar. 19, 2020) (reversing previous denial of bail "in light of circumstances that have changed since the March 6 hearing," namely, "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic").

Recognizing the exceptional and unprecedented nature of the COVID-19 health crisis, courts in the Southern District have released similarly-situated defendants, finding that the crisis constitutes "compelling reasons" under 18 U.S.C. § 3142(i) or "exceptional reasons" under 18 U.S.C. § 3145(c):

- *United States Ramos*, 20 Cr. 04 (ER) (S.D.N.Y. March 19, 2020) (release due to the risk of the COVID-19 virus, despite government's allegations that defendant had continued to engage in felonious conduct, had violated his initial conditions of pre-trial release, and had communicated with witnesses and victims without counsel);
- *United States v. Brandon*, 19 Cr. 644 (GBD) (S.D.N.Y. March 24, 2020) (due to COVID-19 risk, court temporarily released defendant awaiting sentencing following guilty plea to escape from federal custody, over government's objection that defendant was a serial and continuous violator of the law);
- *United States v. Lopez*, 19 Cr. 323 (JSR) (S.D.N.Y. March 26, 2020) (Judge Rakoff denied the government's request for revocation of bail and detention of a defendant who pleaded guilty to crimes of violence, specifically conspiracy to commit Hobbs Act robbery, attempted Hobbs Act robbery, and use of a firearm in relation to a drug trafficking crime. In doing so, Judge Rakoff found that "the Bureau of Prisons is not really equipped to deal with this in anything like the way one would ideally want.")
- *United States v. Stephens*, 15-CR-95 (AJN) (S.D.N.Y. March 19, 2020) (releasing, over government objection, defendant charged with gun possession VOSR who had been remanded two weeks prior);
- *United States v. McDuffie*, 19-CR-212 (VEC) (S.D.N.Y. April 3, 2020) (releasing, over government objection, defendant with rheumatoid arthritis, hypertension,

- and cardiac issues, pending mandatory minimum sentence on drug conspiracy case and despite prior history of possession of firearms);
- *United States v. Roman*; 19-CR-116 (KMW) (S.D.N.Y. March 27, 2020) (releasing post-plea, over government objection, fifty-six year old defendant with medical condition pending sentence on drug conspiracy case);
- *United States v. Witter*, 19-CR-568 (SHS) (S.D.N.Y. March 26, 2020) (releasing, over government objection, defendant with ACE-inhibitor treated hypertension pending sentence in ten-year mandatory minimum drug case);
- *United States v. Vizzari*, 19-CR-767 (VSB) (S.D.N.Y. March 29, 2020) (releasing, over government objection, older defendant with medical conditions including emphysema, COPD, and a potential mass or nodule on his right lung pending sentence on drug conspiracy and VOSR cases);
- *United States v. Perez*, 19-CR-297 (PAE) (S.D.N.Y. March 19, 2020) (releasing, over government objection, defendant with serious progressive lung disease and other significant health issues charged with bail jumping and attempted inducement of a minor, who previously cut off ankle bracelet);
- *United States v. Hudson*, 19-CR-496 (CM) (S.D.N.Y. March 19, 2020) (releasing, over government objection, a defendant in drug conspiracy, loansharking, and extortion case, whose two prior, pre-COVID bail applications were denied, because of inability to prepare for upcoming trial and risk of COVID);
- *United States v. Emanuel*, 20-CR-48 (NSR) (LMS) (releasing, over government objection, defendant with respiratory injuries subsequent to a collapsed lung in Hobbs Act conspiracy case);
- *United States v. Mickey*, 20-CR-135 (CM) (denying government appeal and affirming release of defendant with severe asthma in aggravated assault with a deadly weapon in aid of racketeering case);
- *United States v. Chandler*, 19-CR-867 (PAC) (S.D.N.Y. March 31, 2020) (releasing, over government objection, defendant on felon in possession case, with prior manslaughter conviction, due to inability to prepare for trial due to COVID restrictions);
- *United States v. Taylor*, 19-CR-410 (KPF) (releasing, over government objection, defendant with hypertension and kidney disease, who is both ACCA and career-offender eligible, in drug and 924(c) case);
- *United States v. Mayo*, 19-CR-176 (GBD) (S.D.N.Y. March 30, 2020) (releasing, on consent, defendant with preexisting condition pending sentence in drug conspiracy and firearms trafficking case);
- *United States v. Estime*, 19 Cr. 711 (NSR) (S.D.N.Y. March 27, 2020) (releasing a 33 year-old defendant with no underlying medical issues upon consent, although defendant had a prior drug conviction and faced cocaine conspiracy charge).

**Conclusion**

We appreciate that Mr. Holloway has a serious criminal history and is facing a significant sentence in these matters. However, we are extremely concerned about Mr.

Holloway's health and safety who has been identified by the BOP as "high risk" based on his serious underlying medical condition and lack of adequate medical care. Any incarcerated individual is in serious danger as COVID-19 continues to infect many, particularly in New York City. Perhaps the most frightening aspect of the ongoing crisis is that we still do not know nearly enough about the novel virus. On a daily basis, even our must fundamental understandings of this pandemic are revised. Among the many important issues that are in a constant state of flux: who is particularly vulnerable to infection; what the symptoms and effects of infection are; if infected, who among us are at particularly high risk of death or injury; what the long-term effects of infection are; how the disease is transmitted; whether re-infection is possible; whether multiple waves of re-occurring outbreak will occur; the feasibility and safety of various treatments and vaccines; and the duration of quarantining and other protective measures. All of these questions are subject to ever-changing answers because our scientific community has discovered as many exceptions as rules in studying the virus. We have seen the young, the old, the healthy as well as the sick get infected and die. We have repeatedly re-evaluated our testing and protective measures.

We are, however, certain of at least one thing: mass gatherings and close contact promote the spread of the disease. And we have tragically learned that failure to abide by distancing and hygiene protocols has dire consequences and imperils us all. Thus, the entire world waits in a state of suspended animation with almost all activities canceled, delayed or limited. We wait because death is a very real consequence of underestimating this virus. The defense is aware of the significance of the instant request. However, our proposal is a temporary emergency measure that is necessary to avoid the one unacceptable outcome: death. Malik Holloway should not remain in custody.

Thank you for your consideration.

Respectfully submitted,

/s/ Richard J. Ma

Richard J. Ma

*Counsel to Malik Holloway*

In light of Mr. Holloway's pending application for release from the sentence imposed by the EDNY and the scheduled hearing in that proceeding, the parties are directed to file a joint status report in each of the above-captioned cases promptly upon resolution of the EDNY application and, if the EDNY application is granted to confer and propose a schedule for the completion of briefing and a hearing on the foregoing application. The status report, the proposed schedule and any further briefing shall be filed in each of the above-captioned cases. The Clerk of Court is directed to file this endorsed order in each of the above-captioned cases. DE#91 is hereby resolved in 20 CR 126 (LTS) and the corresponding docket entry is hereby resolved in 19 CR 897 (ALC).

cc via e-mail: A.U.S.A. Adam Hobson
A.U.S.A. Rebecca T. Dell

SO ORDERED.
6/13/2020
/s/ Laura Taylor Swain, USDJ